John Burton, State Bar No. 86029
jb@johnburtonlaw.com
THE LAW OFFICES OF JOHN BURTON
128 North Fair Oaks Avenue
Pasadena, California  91103
Telephone:   (626) 449-8300
Facsimile:   (626) 449-8197

Attorneys for Plaintiff Joston R. Theney

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| JOSTON R. THENEY, | Case No. CV 15-09602 AB (AFMx) |
|---|---|
| Plaintiff, | **PLAINTIFF'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF ISSUES** |
| v. | |
| CITY OF LOS ANGELES, LOS ANGELES POLICE DEPARTMENT, CHIEF CHARLIE BECK, SERGEANTS ANTHONY CHOI AND WILLIAM BATISTA, and OFFICERS RICHMOND AFFUL and MARIA SANTOS, | |
| | Date:       January 9, 2017 |
| | Time:       10:00 a.m. |
| Defendants. | |

Plaintiff Joston Theney hereby submits his attached Separate Statement of Uncontroverted Facts and Conclusions of Law as required by Local Rule 56-1.

| **Uncontroverted Fact** | **Supporting evidence** |
|---|---|
| 1.  On Saturday, October 3, 2015, Plaintiff Joston Theney, a 36-year-old African-American who works in the entertainment industry, left his West Hollywood home in his 1999 Mercury Cougar two-door hatchback for an 8:00 a.m. business meeting on Jefferson Boulevard in the Crenshaw District | Theney Decl., paras 2-5. |

| Uncontroverted Fact | Supporting evidence |
|---|---|
| 2. At 7:55 a.m., defendant LAPD officers Richmond Afful and Maria Santos, using their call sign 7A21, ran Mr. Theney's license plate as he drove on La Brea Avenue toward Venice Boulevard, although there was nothing suspicious about his car, his demeanor or his driving. Officer Santos used the radio because the mobile digital computer (MDC) was not working consistently. | Afful Depo at 34-36; Burton Declaration, Exhibit A. |
| 3. A male Radio Transmission Officer (RTO) in training ran the license plate on the LAPD computer. He responded to Officer Santos that the license plate belong to a 1999 Mercedes "2H." | Afful Depo. at 44, 48; Santos Depo. at 44-46. Burton Declaration, Exhibit B. |
| 4. Both Officer Santos and the male RTO repeated the license plate to each other. | Santos Depo. at 47-48 |
| 5. The supervising RTO broadcast: "7A21, That's the plate that we read. Returns to a 1999 Mercury two-door hatchback." | Exhibit A. |
| 6. Based solely on the supposed mismatching of the license plate to the car, the officers concluded there was "reasonable cause to stop the vehicle and investigate whether the car was stolen or not." | Afful Depo. at 48. |
| 7. The LAPD's practice is that all traffic stops of vehicles believed to have mismatched plates must follow the "high-risk" pullover procedure. | Choi Depo. at 37, 44-45; Batista Depo. at 13-14; Afful Depo. at 53-54, 57. |
| 8. LAPD officers do not have discretion for traffic stops of vehicles believed to have mismatched plates to use the less intrusive procedure associated with moving violations. | Santos Depo. at 23-26, 53-55. |
| 9. Officer Santos called for a helicopter, a supervisor and backup while her unit followed Mr. Theney. | Santos Depo. at 51-52, Afful Depo. at 68. |
| 10. During the almost ten minutes Officers Afful and Santos were following while the helicopter and other units got positioned for the high-risk stop, Mr. Theney did nothing evasive or suspicious. | Afful Depo. at 68-69, 72; Santos Depo. at 58-59; Theney Decl., para. 7 |

| Uncontroverted Fact | Supporting evidence |
|---|---|
| 11. As Mr. Theney turned west onto Jefferson Boulevard, approaching his work meeting, LAPD units blocked the westbound traffic behind him. | Afful Depo. at 57. |
| 12. With backup units pulling into position, the "airship" crew instructed Officer Afful to "light them up," and he activated lights and siren. | Afful Depo. at 70-71. |
| 13. Mr. Theney pulled over immediately. | Afful Depo. at 76-77; Santos Depo. at 60; Theney Decl., para. 8 |
| 14. There were three or four other police cars, each with two officers, backing up Officers Afful and Santos at the time of the stop. | Afful Depo. at 77. |
| 15. The LAPD deployed a primary car, at least four backup units, two sergeants and a helicopter for this high-risk traffic stop, a total of 12 officers on the ground, plus the helicopter and crew. | Choi Depo. at 46-48. |
| 16. The officers exited their cars and took cover behind the ballistic doors. The officers un-holstered their weapons and pointed them at Plaintiff. At least one officer, Alejandro Lopez, had an AR-15 assault rifle. | Afful Depo. at 78, 80; Santos Depo. at 60; Lopez transcript not yet available; Theney Decl., para.10. |
| 17. Mr. Theney was instructed to turn off his car and throw the keys out the window. | Afful Depo. at 85-86; Theney Decl., paras. 9-13 |
| 18. Mr. Theney was instructed to reach out the window and open the door from the outside. | Afful Depo. at 85-86; Theney Decl., paras. 9-13 |
| 19. Mr. Theney was instructed to exit the car with both of his hands raised. | Afful Depo. at 85-86; Theney Decl., paras. 9-13 |
| 20. Mr. Theney was instructed to lift his sweater over his head and twirl around. | Afful Depo. at 85-86; Theney Decl., paras. 9-13 |
| 21. Mr. Theney was instructed to walk backward, toward the officer's voice. | Afful Depo. at 85-86 |
| 22. Mr. Theney was instructed to get on his knees | Afful Depo. at 85-86; Theney Decl., paras. 9-13 |
| 23. Mr. Theney was instructed to lay prone on Jefferson Boulevard. | Afful Depo. at 85-86; Theney Decl., paras. 9-13 |

| **Uncontroverted Fact** | **Supporting evidence** |
|---|---|
| 24. Mr. Theney was instructed to spread his arms and legs, press his palms and heels down, and face to the left, away from the car, so that the right side of his face was on the street. | Afful Depo. at 85-86; Theney Decl., paras. 9-13 |
| 25. Mr. Theney had trouble hearing the commands because of the helicopter, and signaled to the officers | Santos Depo. at 65-66; Theney Decl., paras. 10 |
| 26. As other officers checked whether there was anyone else in the car, Mr. Theney remained compliant, on the ground, spread eagle, with the right side of his face on Jefferson Boulevard. | Afful Depo. at 89-90. |
| 27. Officers Afful and Santos approached with their guns out, pointed "down-range towards Mr. Theney." | Santos Depo. at 66-67. |
| 28. Without giving Mr. Theney any explanation for the stop, Officer Afful holstered his weapon, placed his right knee into Mr. Theney's upper back, and handcuffed him. | Afful Depo. at 92-94. |
| 29. With his knee still in Mr. Theney's back, Officer Afful felt inside his waistband for weapons, assisted Mr. Theney to his feet and walked him to the sidewalk, where Officer Afful conducted a second, "thorough search of his person." | Afful Depo. at 99-100. |
| 30. While Officer Afful was searching Mr. Theney for a second time, Officer Santos walked over to the police car where another officer ran the license plate on an MDC and saw that it came back to the car the officers pulled over. | Santos Depo. at 70-72; Burton Decl., Exhibit C (MDC printout) |
| 31. Five minutes later, the officers ran Mr. Theney for "wants and warrants." | Ex. C; Batista Depo. at 24-30. |
| 32. Mr. Theney was released after about 15 to 20 minutes in handcuffs, making the whole incident about a half hour. At Mr. Theney's request, Sergeant Choi accompanied him to his work, and explained to a supervisor why Mr. Theney was prone in the street when he should have been at the work meeting. | Theney Decl., paras. 15, 18. |

## CONCLUSIONS OF LAW

1. Police may stop a person for an investigatory detention without violating the Fourth Amendment only when they have reasonable suspicion that the person is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968).

2. Reasonable suspicion must be formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity. *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002)

3. Police may rely on information provided by others in forming reasonable suspicion. *United States v. Hensley*, 469 U.S. 221, 229-32 (1985); *United States v. Fernandez-Castillio*, 324 F.3d 1114, 1118 (9th Cir. 2003).

4. *Terry* makes "imperative," however, "that the facts be judged against an objective standard: would the facts *available to the officer* at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22 (emphasis added).

5. There was no reasonable suspicion because the RTO supervisor broadcast that the plates belonged to a Mercury, the brand Plaintiff was driving.

6. Reasonable suspicion for a *Terry* stop does not mean that a pat-down search can be conducted, much less two of them. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1022 (9th Cir. 2009). There was no ground for a pat-down of Plaintiff as there was no reason to believe he was armed and dangerous.

7. The high-risk tactics to which to which Plaintiff was subjected exceeded those allowed for a *Terry* stop under the benign circumstances presented, and rendered the LAPD's seizure of Mr. Theney a de facto arrest requiring probable cause. *Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996).

8. Intrusive means for effecting a stop are lawful only in special circumstances, such as 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the

suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur. *Id.* at 1189.

9. The fact that plaintiff was stopped on suspicion of a stolen vehicle does not by itself demonstrate that he presented a danger to the officers, such as to justify intrusive tactics. *Green v. City and Cty. of San Francisco*, 751 F.3d 1039, 1044 (9th Cir. 2014).

10. In this case the officers conducted a de facto arrest, not a *Terry* stop.

11. There was no probable cause to arrest Mr. Theney, accordingly, the high-risk traffic stop violated his Fourth-Amendment rights.

12. The LAPD practice that requires officers to perform high-risk traffic stops whenever a vehicle is thought to have the wrong license plates was the moving force that caused the violation of Mr. Theney's Fourth-Amendment rights because that practice prevents officers from considering factors such as whether the person is uncooperative or a flight risk, whether the person is armed, whether the stop closely follows a violent crime, and whether a crime of violence is likely to occur.

Respectfully submitted,

Dated: November 28, 2016        THE LAW OFFICES OF JOHN BURTON

                                By: /s/John Burton
                                    ─────────────────
                                    John Burton
                                    Attorneys for Plaintiff